# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | | |
|---|---|---|
| STEVEN BRISTOW, ) | Civil Action No. 7:15-cv-00316 | |
|     Plaintiff, ) | | |
| ) | | |
| v. ) | **MEMORANDUM OPINION** | |
| ) | | |
| DR. DULANEY, et al., ) | By: Hon. Robert S. Ballou | |
|     Defendants. ) | United States Magistrate Judge | |

Steven Bristow, a Virginia inmate proceeding pro se, commenced a civil rights action pursuant to 42 U.S.C. § 1983. The only remaining defendant is Dr. Dulaney, who is licensed to practice osteopathic medicine in the Commonwealth of Virginia and is a Board Certified Family Physician. Dr. Dulaney provided medical care to inmates at WRSP for two days per week between August 18, 2014, and February 9, 2016. Bristow alleges that Dr. Dulaney was deliberately indifferent to his serious medical condition as he suffered from hemorrhoids which caused bleeding and pain. Dr. Dulaney has filed a motion for summary judgment along and attached a copy of Bristow's relevant medical records relating to Dr. Dulaney's evaluation, diagnoses, and treatment of the hemorrhoid condition for several years. Bristow has responded to the motion, making this matter ripe for disposition. After reviewing the record, I grant Dr. Dulaney's motion for summary judgment because the extensive treatment records do not show that Dr. Dulaney acted with deliberate indifference to Bristow's serious medical need.[1]

## I.
### A.

Hemorrhoids are swollen veins located around the anus or in the lower rectum and may cause itching, irritation and pain, fecal leakage, painful bowel movements, and blood on toilet tissue after a bowel movement. Some people also may experience anemia, weakness, and pale

---

[1] The parties have consented to the disposition of this matter in accordance with 28 U.S.C. § 636(c)(1).

skin due to blood loss. A health care provider may diagnose hemorrhoids through both a visual and digital rectal exam.

Hemorrhoids often go away without any treatment, but treatments are available. Initial treatment may include pain relief, topical treatments, and fiber supplements. If these methods are not successful, a rubber band ligation procedure may be performed, and if not successful, a hemorrhoidectomy may be performed. A rubber band ligation procedure involves cutting off the circulation to the hemorrhoid by placing a rubber band around it, causing it to shrink and fall off within two days. The rubber band is expected to fall off, too, which typically indicates that the procedure was effective.

**B.**

The record reflects that Bristow had a ten-plus year history of chronic, but infrequent, internal hemorrhoids before Dr. Dulaney became his physician in August 2014. Bristow's prison health record contains no hemorrhoid complaints between February 2009 and January 2014.

In February 2014, Bristow complained of blood in his stools. A physician with Wellmont Medical Associates evaluated Bristol in March 2014. That examination was negative for a prolapsed hemorrhoid, nausea, vomiting, abdominal pain, abdominal distention, or external abnormalities. The Wellmont Medical physician diagnosed Bristol with internal hemorrhoids and planned to schedule a colonoscopy and possible rubber band ligation of the hemorrhoid. After the March 2014 examination, however, the Wellmont Medical physician announced his retirement scheduled for June 18, 2014, and recommended Dr. Ernspiker, another physician at Wellmont Medical to take over Bristow's care. A prison facility doctor, thereafter, referred Bristow to Dr. Ernspiker on August 15, 2014.

In early August 2014, Bristow reported to the medical department at the prison facility that he had bleeding hemorrhoids. A facility doctor examined him, determined he was anemic, and ordered an iron supplement, a complete blood count, a colonoscopy, and rubber band ligation. Dr. Ernspiker performed the colonoscopy and the banding procedure, noting that Bristow tolerated the procedure well. Bristow returned to WRSP on August 26, 2014, and denied feeling any pain, but reported that a rubber band had fallen out.

## C.

Dr. Dulaney first examined Bristow on August 27, 2014, after Bristow returned from the banding procedure. Bristow was alert, oriented, and in no apparent distress. Bristow reported that two more rubber bands came out but denied rectal bleeding. Dr. Dulaney confirmed with Dr. Ernspiker that rubber bands routinely fall out after a rubber band ligation procedure, and she informed Bristow of her conversation with Dr. Ernspiker. Dr. Dulaney also prescribed two tables of Tylenol, 500 mg twice per day for three days to treat pain. A nurse noted that Bristow walked without difficulty and with a steady gain as he left the medical department.

Bristow complained at the September 4, 2014 sick call of his hemorrhoids and asked to see the doctor. The nurse's notes reflect that Bristow maintained a steady gait, and refused vital sign measurements. The nurse referred him to a doctor for further evaluation.

Dr. Dulaney evaluated Bristow on September 15, 2014, in the housing pod. Bristow reported swelling, decreased bleeding, decreased pain, a protruding hemorrhoid, and difficulty walking. Bristow's vital signs were stable and he was in no apparent distress. Dr. Dulaney gave him a master pass to come to medical for a rectal examination.

Dr. Dulaney performed a rectal examination two days later which revealed a three-centimeter prolapsed, non-thrombosed internal hemorrhoid. Initially, Dr. Dulaney ordered that Bristow apply Dibucaine ointment, twice per day, take Preparation-H suppositories, twice per day for thirty days, and use a stool softener, 100 milligrams daily for three days.[2] Dr. Dulaney based this treatment decision on Bristow's reports of decreased bleeding and pain.

The medical record reflects that Bristow made no complaints about hemorrhoids between September 18, 2014, and March 23, 2015. Dr. Dulaney states that she did not know of any medically necessary reason to refer Bristow for an outside procedure during this period because Bristow did not report any complaints about his hemorrhoids during that time.

On March 24, 2015, Bristow complained to medical staff about blood in his stools, swelling, pain, and dizziness. Three days later, Bristow complained that he had no improvement since the surgery in September 2014, and thereafter, the medical staff scheduled an appointment with Dr. Bristow.

On March 30, 2015, Bristow told Dr. Dulaney he felt dizzy while standing and had dark blood in his stools at each bowel movement. Dr. Dulaney noted Bristow appeared well and was in no apparent distress although the inner lining of his eyelid was pale. Dr. Dulaney ordered a complete blood count, thyroid-stimulating hormone blood test, and a comprehensive metabolic panel blood test. The blood work was drawn the next day, and the lab results were reported to the medical department on April 2, 2015.

Dr. Dulaney reviewed the lab results on April 8, 2015, which was the next day she was at WRSP after the lab results were reported. The lab results showed low levels of hemoglobin and

---

[2] Dibucaine is a topical anesthetic used to relieve the pain and itching, and Preparation-H suppositories are used to relieve itching, burning, irritation and swelling.

hematocrit. Dr. Dulaney examined Bristow's rectum later that morning at 11:20 a.m. The examination was painful but unrevealing. Because Bristow appeared pale and weak, Dr. Dulaney believed Bristow was experiencing anemia secondary to blood loss with some degree of iron deficiency. Dr. Dulaney ordered that Bristow remain in the medical department, that he have hemoglobin and hematocrit blood tests run "stat," and that he have an "urgent" evaluation by Dr. Ernspiker. Notably, Dr. Dulaney classified the medical issue as "urgent" and not as an emergency which would require an immediate transfer to an emergency room. Dr. Dulaney reviewed the results of the hemoglobin and hematocrit test at 3:15 p.m. and decided to maintain the current plan for Dr. Ernspiker to examine Bristow at the earliest opportunity.

The same day, Dr. Ernspiker evaluated Bristow and diagnosed stomach inflammation and hemorrhoids. Dr. Ernspiker recommended that Bristow take stool softener daily and scheduled him to undergo a colonoscopy and hemorrhoidectomy for April 20, 2015. Dr. Ernspiker did not deem Bristow's medical condition sufficient urgent to require immediate transfer to the emergency department for treatment. Dr. Dulaney also ordered stool softener; suppositories, twice daily for twenty days; and iron supplements, twice daily for thirty days. Bristow remained in the medical department for monitoring between April 9 and 18, 2015. The records of Bristow's stay in the medical department reveal regular monitoring of his condition and his interactions with Dr. Dulaney and medical staff.

On April 10, 2015, Bristow complained to Dr. Dulaney of weakness while standing at the door. The examination that day showed that Bristow appeared well, but pale, with stable vital signs. Bristow remained scheduled for a colonoscopy and hemorrhoidectomy on April 20.

Dr. Dulaney's evaluation on April 13 at 4:05 p.m. showed that Bristow remained stable with complaints of headaches. Bristow appeared well and was in no apparent distress. Dr. Dulaney diagnosed Bristow with anemia.

On April 14, Bristow complained to medical staff about a headache. He took his medication, including Tylenol for the headache, and his vital signs were stable. Bristow's headache improved later that day.

On April 15 at 1:30 p.m., Bristow complained of feeling poorly, fatigue, and having a headache. Dr. Dulaney examined Bristow and found that he appeared tired but was in no apparent distress. Dr. Dulaney ordered hemoglobin and hematocrit tests and reminded Bristow to rest and allow staff to measure his vital signs. Dr. Dulaney also instructed medical staff to call her if Bristow's heart rate was greater than 100 beats per minute. At 5:25 p.m., Bristow did not voice any complaints to medical staff, was alert and oriented, and had even and unlabored respiration.

On April 16 at 6:00 a.m., Bristow had no complaints other than feeling dizzy. He took his medication, his vital signs were stable, and no signs of distress were noted in his chart. At 5:45 p.m., Bristow was alert and oriented, had even and unlabored respiration, walked to the cell door with a steady gait, said that he felt better, and refused to have his vital signs taken. At 7:40 p.m., Bristow complained of blood in his stools, was alert and oriented, had even and unlabored respiration, and had stable vital signs. Bristow noted that the blood in his stools had decreased. At 9:30 p.m., Bristow was alert and oriented, walked to the door, did not voice any complaints, reported that he had no more blood in his stools, and had stable vital signs.

On April 17 at 6:15 a.m., Bristow complained of weakness but denied passing blood in his stools since the previous night. Bristow was advised to stay hydrated and report any blood in his stools. At 5:25 p.m., Bristow did not voice any complaints and refused to have his vital signs taken. Medical staff continued to monitor him and instructed him to report any blood in his stools.

On April 18 at 5:50 a.m., Bristow did not voice any complaints, was alert and oriented, denied discomfort, and refused to have his vital signs taken. At 6:45 a.m., Bristow was alert, oriented and cooperative, took his medication, and denied discomfort. At 8:00 a.m., Bristow had stable vital signs and was alert, oriented and cooperative.

At 8:30 a.m. on April 18, Bristow's most recent lab results showed that his hemoglobin had dropped to 6.5 and his hematocrit was 21. Both levels were low, which prompted Dr. Dulaney immediately to order that Bristow be transported to Mountain View Regional Medical Center ("MVRMC") in Norton, Virginia, for a possible blood transfusion.

By the time Bristow arrived at MVRMC at 9:49 a.m., his hemoglobin and hematocrit had increased to 8.0 and 25.5. His medical examination showed Bristow oriented to person, place and time; that he was in no distress, denied abdominal pain, diarrhea, constipation, fever, chills, nausea, or vomiting, and did not have any bright red blood in his stools, but that he reported mostly dark, tarry stools. The healthcare providers at MVRMC noted that Bristow's hemoglobin and hematocrit levels were trending up and that he was asymptomatic from anemia. Bristow refused an offered blood transfusion unless his condition was life threatening. Bristow's condition was not deemed life threatening, so MVRMC released him back to WRSP. Bristow remained scheduled for surgery with Dr. Ernspiker on April 20, 2015.

On April 20, 2015, Bristow underwent a colonoscopy and hemorrhoidectomy with Dr. Ernspiker and tolerated the procedure well. Dr. Ernspiker also performed an EGD (examination of the esophagus) during the operation which revealed that Bristow had diffuse gastritis, but no evidence of ulcers or active bleeding. Bristow reported feeling moderate pain upon returning to WRSP with stable vital signs. Dr. Dulaney prescribed Tylenol with codeine, twice per day for 10 days for pain, and MiraLax, twice per day for 14 days to stimulate bowel movements.

Dr. Dulaney evaluated Bristow on April 22 at 4:45 p.m. Bristow had not had a bowel movement in two days, noting that he felt no need to have a bowel movement. This did not concern Dr. Dulaney, but nonetheless, she advised Bristow to start taking MiraLax. Dr. Dulaney told the nursing staff to notify her if Bristow did not have a bowel movement the next day.

By April 23 at 5:32 p.m., Bristow still had not had a bowel movement, but remained in no apparent distress, was talking and laughing at his cell door, and refused to have his vital signs taken. Dr. Dulaney ordered staff to give him one dose of MiraLax that evening.

On April 25 at 5:30 p.m., Bristow reported having a bowel movement and that it hurt some. He was in no apparent distress, refused to have his vital signs taken, and requested a copy of his medical records.

Dr. Dulaney reviewed Bristow's chart on April 27 and ordered that the current treatment regime continue.

On April 29 at 1:45 p.m., Bristow asked to leave the medical department and return to the general population housing pod. He had some complaints of pain, denied rectal bleeding, and asked for ointment. At 2:37 p.m., Dr. Dulaney evaluated Bristow and noted he was in no apparent distress. Dr. Dulaney gave him ointment to use on the surgical site twice a day for two

weeks, issued a bottom bunk pass for two weeks, and discharged him from the medical department. Dr. Dulaney also prescribed Motrin, twice per day for fourteen days; an iron supplement, once a day for sixty days; and ordered a comprehensive blood count in thirty days.

On June 3, 2015, Bristow asked medical staff for more MiraLax because, although he felt good, he was still constipated. He denied bleeding and was in no apparent distress. Lab results showed Bristow's hemoglobin had increased from his post-surgical lab work. Dr. Dulaney increased Bristow's iron supplements to twice per day for ninety days and prescribed MiraLax to stimulate bowel movements. Dr. Dulaney also ordered a comprehensive metabolic panel blood test and another comprehensive blood count to be drawn in thirty days. Those lab results showed that Bristow's hemoglobin and hematocrit had increased to 11.0 and 35.5. The medical records show that Bristow made no other complaints and received no additional medical treatment for his medical condition from July 13, 2015, to January 15, 2016.

On January 16, 2016, Bristow asked for more iron supplements. Two days later, Dr. Dulaney ordered another comprehensive metabolic panel blood test and another comprehensive blood count. Dr. Dulaney did not believe Bristow had an iron deficiency and, thus, did not prescribe iron supplements. Dr. Dulaney stopped providing care to Bristow and other inmates at WRSP on February 9, 2016.

## II.
### A.

A party is entitled to summary judgment if the pleadings, the disclosed materials on file, and any affidavits show that there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a). Material facts are those necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine dispute of material fact

exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. Id. The moving party has the burden of showing – "that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the non-movant must set forth specific facts that demonstrate the existence of a genuine dispute of fact for trial. Id. at 322-24. A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991). "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion." Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 62 (4th Cir. 1995). A plaintiff cannot use a response to a motion for summary judgment to amend or correct a complaint challenged by the motion for summary judgment. Cloaninger v. McDevitt, 555 F.3d 324, 336 (4th Cir. 2009).

**B.**

A prison inmate has an Eighth Amendment right to constitutionally adequate medical care, and can state an Eighth Amendment claim for denial of medical care where the defendant acts, or fails to act, with a deliberate indifference to a serious medical need. See Estelle v. Gamble, 429 U.S. 97, 106 (1976). Proof of deliberate indifference to a serious medical need contains both an objective prong that Bristow suffered from a serious medical need, and a subjective prong that prison staff was aware of that need and either failed to provide care or to ensure that the care was provided. Farmer v. Brennan, 51 U.S. 825, 837 (1994). A medical need serious enough to give rise to a constitutional claim involves a condition that "has been

10

diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008).

Subjectively, deliberate indifference requires a state actor to have personal knowledge or awareness of facts indicating a substantial risk of serious harm, and the actor must have actually recognized the existence of such a risk. Farmer, 511 U.S. at 838. "Deliberate indifference may be demonstrated by either actual intent or reckless disregard." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990); see Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004) ("[T]he evidence must show that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.'"). "A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position." Miltier, 896 F.2d at 851-52. A health care provider may be deliberately indifferent when the treatment provided is so grossly incompetent, inadequate, or excessive as to shock the conscience or is intolerable to fundamental fairness. Id. at 851.

Viewing the evidence in the light most favorable to Bristow, the record does not show that Dr. Dulaney acted with a reckless disregard for Bristow's medical needs or that she subjectively recognized that her actions were inappropriate in light of the risk the hemorrhoids posed to Bristow. Dr. Dulaney repeatedly treated Bristow between August 27 and September 17, 2014 following the rubber band ligation procedure performed by Dr. Ernspiker. No evidence has been provided that Dr. Dulaney was aware of any complaint from Bristow about blood in his stools or issues with hemorrhoids between September 18, 2014 and March 23, 2015. The

medical record reflects that when Dr. Dulaney became aware on March 27, 2015 that Bristow continued to have blood in his stools, she repeatedly treated him for his complaints through February 9, 2016 when she no longer worked at WRSP. This treatment included regularly monitoring Bristow's condition, prescribing medications, and referring him to an appropriate specialist for surgical intervention.

Dr. Dulaney is not liable under § 1983 for any delays in Bristow's care before August 27, 2014, when she started treating inmates at WRSP. The record does not show a genuine dispute of material fact that Dr. Dulaney showed a reckless indifference to Bristow's medical needs once he came under her care. Accordingly, Dr. Dulaney is entitled to summary judgment.

### III.

For the foregoing reasons, I grant Dr. Dulaney's motion for summary judgment.

Enter: June 28, 2017

/s/ Robert S. Ballou

Robert S. Ballou
United States Magistrate Judge